## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

| | | |
|---|---|---|
| SHARON WESLEY, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | CIVIL ACTION NO. 17-0302-CG-N |
| | ) | |
| AUSTAL USA LLC, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

## MEMORANDUM OPINION AND ORDER

This matter is before the Court on Defendant's motion for summary judgment (Doc. 40), Plaintiff's opposition thereto (Doc. 48), and Defendant's reply (Doc. 52). For the reasons explained below, the Court finds that summary judgment should be granted in favor of Defendant.

## FACTS

The Plaintiff in this case is a black female who alleges she was discriminated against by her employer, Austal, USA, LLC ("Austal") on the basis of her race and gender when she was denied a promotion from a Test and Activation Specialist I ("Specialist I") to a Test and Activation Specialist II ("Specialist II"), in 2015. (Doc. 1). Austal, headquartered in Mobile, Alabama, is the prime contractor, designer and manufacturer of the U.S. Navy's Independence-variant Littoral Combat Ship ("LCS"). (Doc. 42-1, ¶ 2). Plaintiff became employed with Austal in March 2011 as an electrical Apprentice and later became a Specialist I on April 7, 2014. (Doc. 42-1, ¶ 5).

Mike Bell, who was Austal's Vice President of Operations, Steve Williamson, Austal's Director of Tests and Activation, and Scott Brown, Austal's Hull Tests Manager determined the need for multiple Specialist II positions. (Doc. 42-2, ¶ 7). Bell and Williamson gave Brown the direction and authority to move forward in that regard and gave Brown full authority to make the selection decision with feedback from Senior Specialists Jarrod Stubbs and Conrad Harris. (Doc. 42-2, ¶ 7). On April 16, 2015, Austal posted internally a list of job openings that included openings for the position of Test and Activation Specialist II. (Doc. 42-1, p. 7). The qualification, knowledge and experience listed for the position included:

> Two (2) to four (4) solid years Test and Activation experience in a shipyard environment OR
> Test training equivalent to 2 years technical trade school or military technical school, AND/OR-Navy, Coast Guard or Merchant Mariner experience. …

(Doc. 42-1, p. 8). According to Brown, the "keystone factor" he was looking for in any applicant that had worked as a Specialist I "was a demonstrated readiness to 'own' a system." (Doc. 42-3, ¶ 3). Brown explained this factor as follows:

> … whereas a Specialist I is an entry-level testing position working under close supervision to perform routine test technician duties in support of Test Engineers and higher-level Specialists, the Specialist II works under limited supervision to perform moderately complex test technician duties on the system(s) that he/she "owns:" based on a combined assessment of skill, proficiency, experience, and interest, a Specialist II is assigned "ownership" of one or more of the ship's systems, in which case that employee has the primary responsibility for seeing the system's testing through to successful fruition and completion. … I was looking to promote the Specialist Is who already had been acting and performing as a system owner even before formally promoting to a Specialist II.

(Doc. 43-3, ¶ 3). Brown reports that he gave no consideration to how long an

applicant had been employed at Austal or as a Specialist I. (Doc. 43-3, ¶ 4).

> Motivation and self-drive were key factors in determining the
> applicants that got selected for the promotions. If the applicant had not
> shown that he/she was ready to own a system, regardless of the extent
> of his/her tenure at Austal, time as a Specialist I, or prior work history
> or experience, I was not going to promote him/her.

(Doc. 42-3, ¶ 4).  Brown conferred with Stubbs and Harris and Brown made the

selection decision. (Doc. 42-3, ¶ 5).

Plaintiff applied for the Specialist II promotion on April 21, 2015, by

submitting a resume that showed she had approximately one year of testing

experience by virtue of her tenure as a Specialist I since April 2014 and did not

mention any prior testing experience or testing equivalent. (Doc. 42-1, ¶ 5; Doc. 42-

3, ¶ 6).  Plaintiff listed her experience as an Electrical Apprentice at Austal but did

not include the fact that she had performed connectivity or continuity tests as an

electrical Apprentice. (Doc. 42-3, ¶ 6, Doc. 42-3, pp. 17-18). Plaintiff testified at her

deposition that as an electrical apprentice she conducted connectivity tests and

continuity tests but according to Defendant, her reported "tests" are really just

"checks" and are not the same as the "formalized, documented, and witnessed Stage

Tests" that Specialists conduct. (Doc. 42-4, p. 1; Doc. 42-2, ¶ 3).

Brown reports that he still considered Plaintiff's application as if she was

qualified, but he did not believe she was among the most qualified applicants

because she had not demonstrated her readiness to "own" a system. (Doc. 42-3, ¶ 7).

Stubbs, who was the Senior Specialist with testing oversight of a vessel on which

Plaintiff had worked as a Specialist I, did not recommend Plaintiff for the promotion

because he also did not believe she was among the most qualified applicants because she had not demonstrated her readiness to "own" a system. (Doc. 42-5, ¶ 4). Brown assessed Plaintiff's work as a Specialist I and her readiness to be promoted to a Specialist II as follows:

> As a Specialist I, Ms. Wesley was assigned to support the 60 Hz, AFFF, Bilge, HFP, and Water Mist systems. In supporting those systems, I did not assess that she was proactive in initiating testing activity to take ownership of those systems. Ms. Wesley did not look ahead of the schedule and plan tasks according to the work that was lying ahead, rather she simply waited to be assigned testing tasks to complete, which is consistent with the expectations of a Specialist I but not consistent with the expectations of a Specialist I striving to advance to a Specialist II. I observed that Ms. Wesley was productive as long as she was assigned tasks and that she was willing to help out as long as assistance was needed within her comfort zone, but I was looking to promote the Specialist Is who had sought growth within the department by volunteering or requesting stretch assignments beyond their Specialist I job description, which Ms. Wesley had not done. More specifically, I observed that Ms. Wesley showed little-to-no interest, drive, or ability to become a lead by initiating testing tasks vis-a-vis working from limited documentation, schematics, diagrams, notes, production prints, or layouts, performing operational/functional tests, troubleshooting or debugging assemblies, subassemblies, and systems to isolate faults and determine remedies for malfunctions, setting-up specialized test equipment for checkout of non-routine assemblies and systems, utilizing normal or specialized manufacturing tests or diagnostic equipment specific to the products, preparing diagnostic tests or assisting in the design, construction, test, or checkout of complex test equipment and test procedure development, or utilizing a wide variety of developmental/manufacturing test or diagnostic equipment to checkout, test, and troubleshoot complex or complete systems. Whether because of her perceived disinterest in taking on system ownership or because she, in fact, lacked a more advanced skillset, either way Ms. Wesley only demonstrated to me a limited ability to read and interpret electrical and piping system diagrams, schematics and drawings, and testing procedures, as well as only cursory knowledge of marine equipment operation, mechanical and electrical propulsion and electrical power-generating equipment, industrial or marine ancillary machinery systems installation and operation, and diesel engines or gas turbines. In short, she simply did

not show me that she was ready for the next step, and I genuinely did
not believe that she was among the most qualified of the applicants, if
she was qualified at all.

(Doc. 42-3, ¶ 8).  Plaintiff admits that "sometimes" she lacked motivation to offer

"assistance to team members" when she worked as a Specialist I.  (Doc. 42-4, p. 5).

Twenty-seven employees were considered as applicants. Twenty-three of

those applicants, including Plaintiff, were considered minimally qualified and

moved forward for consideration and twenty of those were ultimately selected for

the Specialist II positions. Of the twenty, fourteen were Caucasian males, three

were African-American males, one was an African-American female, and two were

Hispanic males. The three not selected were Plaintiff and two Hispanic males. (Doc.

42-1, ¶ 4).

After Brown made the selection decisions, he met with Plaintiff and informed

her that while he thought she was a good Specialist I, her resume failed to

demonstrate that she had the requisite two year testing experience or testing

equivalent and she had also not demonstrated to him that she desired system

ownership. (Doc. 42-3, ¶ 9).  On July 30, 2015, following the meeting with Brown,

Plaintiff submitted an updated resume in support of her application for the

Specialist II promotion that stated that she had performed cable insulation

resistance tests as an electrical Apprentice. (Doc. 42-1, ¶ 5; Doc. 42-3, ¶ 10).  Brown

admits that cable insulation resistance tests are formulized Stage 2 Tests, which

would qualify as experience for a Specialist II position. (Doc. 42-3, ¶ 10). At her

deposition when asked about the work she did as an electrical Apprentice, Plaintiff

described the work she did and "tests" she conducted but did not include cable insulation resistance tests as one of her duties. (Doc. 42-4, p. 1). Even if Plaintiff had the required experience, Brown still did not deem Plaintiff to be among the most qualified applicants "because of her failure to demonstrate readiness to own a system." (Doc. 42-3, ¶ 10).

Plaintiff reports that as a Specialist I, she "owned" several systems at different times including the electrical part of Damage Control, the Galley, Laundry Room and Pneumatics. (Doc. 48-1, ¶ 9). Plaintiff reports that she performed Level II work while she was a Specialist I. (Doc. 48-1, ¶ 10). Ashlon Smith is an African American female that worked as a Specialist I with Plaintiff. (Doc. 50-1, ¶¶ 2, 3). Smith was promoted to Specialist II and continued working with Plaintiff after Smith was promoted to Specialist II. (Doc. 50-1, ¶ 7). According to Smith, Plaintiff was doing and was able to do the exact same things Smith was doing as a Specialist II. (Doc. 50-1, ¶ 7). Smith reports that Plaintiff "had ownership of the electrical part of Damage Control, Galley, Laundry Room and I believe Pnumatics." (Doc. 50-1, ¶ 10).[1]

---

[1] In her opposition to summary judgment Plaintiff only included a few cites to evidentiary material and some of those cites were to nonexistent or incorrect material. The Court has reviewed the evidentiary materials Plaintiff filed but will not scour the material in detail to attempt to find support for Plaintiff's position. The Court has included material from Plaintiff's affidavit and Smith's affidavit out of an abundance of caution in an effort to better discover and portray the truth of the matters at issue. Plaintiff filed other exhibits that include copies of emails and other correspondence between Austal employees and/or with Plaintiff. The Court, after reviewing all of the evidence submitted by Plaintiff with her response to summary judgment, finds none of the evidence indicates discriminatory intent or otherwise supports Plaintiff's claims. Moreover, Plaintiff's failure to cite "to particular parts of materials in the record" violates FED. R. CIV. P. 56(c)(1)(A) and Local Rule 56(b).

In her response in opposition to summary judgment, Plaintiff points to two employees who were promoted that she contends were less qualified than , Jedfrey Weninegar and Josh Adair. (Doc. 48, pp. 15-16). However, Plaintiff testified during her deposition that Weninegar had worked at Austal for a long time and had worked with testing and therefore that she was <u>not</u> challenging his promotion. (Doc. 42-4, p. 9). Josh Adair, who was promoted to Specialist II on June 29, 2015, had the following prior experience:

> Josh Adair, a Caucasian male, became a Specialist I at Austal on September 15, 2014, and immediately prior to that time, held a Fire Safety Officer/Fire Brigade position in Austal's Safety Department beginning February 11, 2013. Mr. Adair's represented prior key experience also included one year of testing damage control systems through his employment with the Prichard Fire Rescue from January 2012 until he came to work at Austal on February 11, 2013.

(Doc. 42-1, ¶ 6). According to Brown, Adair was selected over Plaintiff for the promotion because:

> he had demonstrated his readiness to move to a Specialist II. As a Specialist I, Mr. Adair initially supported the Twin-Boom Extensible Crane, MOBICON, Ride Control Stern Door, and Side Ramps, but ultimately, he progressed to own those systems, not just support them. In so doing, I was able to discern that, as compared to Ms. Wesley, he had a greater knowledge, or a greater demonstrated knowledge, of marine equipment operation, mechanical and electrical propulsion and electrical power-generating equipment, shipboard engineering plant terminology and operations, industrial or marine ancillary machinery systems installation and operation, and of diesel engines and gas turbines, as well as a greater demonstrated ability to read and interpret electrical and piping system diagrams, schematics, drawings, and testing procedures. Based on my own observations and experience as well as the input and feedback I gathered from Mr. Stubbs and Mr. Harris, there were no areas as to the required qualifications, knowledge, or experience where I genuinely believed that Ms. Wesley was more qualified than Mr. Adair. Moreover, in owning the systems rather than simply supporting them, Mr. Adair already was acting as a

Specialist II and displaying a greater ability than Ms. Wesley to
perform as a Specialist II in the following areas: working from limited
documentation, schematics, diagrams, notes, production prints, and
layouts; performing operational/functional tests, troubleshooting, and
debugging assemblies, subassemblies, and systems to isolate faults
and determine remedies for malfunctions; setting-up specialized test
equipment for checkout of non-routine assemblies and systems;
utilizing normal and specialized manufacturing test or diagnostic
equipment specific to the products, prepare diagnostic tests and assists
in the design, construction, test, and checkout of complex test
equipment and test procedure development; and utilizing a wide
variety of developmental/manufacturing test or diagnostic equipment
to check out, test, and troubleshoot complex or complete systems.
Based on my own observations and experience as well as the input and
feedback I gathered from Mr. Stubbs and Mr. Harris, there were no
areas of Specialist II-level work where I genuinely believed that Ms.
Wesley was demonstrating a greater ability than Mr. Adair to perform
at the Specialist II capacity.

(Doc. 42-3, ¶ 12).

# DISCUSSION

## A. Summary Judgment Standard

Federal Rule of Civil Procedure 56(a) provides that summary judgment shall

be granted: "if the movant shows that there is no genuine dispute as to any material

fact and the movant is entitled to judgment as a matter of law." The trial court's

function is not "to weigh the evidence and determine the truth of the matter but to

determine whether there is a genuine issue for trial." *Anderson v. Liberty Lobby,*

*Inc.*, 477 U.S. 242, 249 (1986). "The mere existence of some evidence to support the

non-moving party is not sufficient for denial of summary judgment; there must be

'sufficient evidence favoring the nonmoving party for a jury to return a verdict for

that party.'" *Bailey v. Allgas, Inc.*, 284 F.3d 1237, 1243 (11th Cir. 2002) (quoting

*Anderson*, 477 U.S. at 249). "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson*, at 249-250. (internal citations omitted).

The basic issue before the court on a motion for summary judgment is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *See Anderson*, 477 U.S. at 251-252. The moving party bears the burden of proving that no genuine issue of material fact exists. *O'Ferrell v. United States*, 253 F.3d 1257, 1265 (11th Cir. 2001). In evaluating the argument of the moving party, the court must view all evidence in the light most favorable to the non-moving party, and resolve all reasonable doubts about the facts in its favor. *Burton v. City of Belle Glade*, 178 F.3d 1175, 1187 (11th Cir. 1999). "If reasonable minds could differ on the inferences arising from undisputed facts, then a court should deny summary judgment." *Miranda v. B&B Cash Grocery Store, Inc.*, 975 F.2d 1518, 1534 (11th Cir. 1992) (citing *Mercantile Bank & Trust v. Fidelity & Deposit Co.*, 750 F.2d 838, 841 (11th Cir. 1985)).

Once the movant satisfies his initial burden under Rule 56(c), the non-moving party "must make a sufficient showing to establish the existence of each essential element to that party's case, and on which that party will bear the burden of proof at trial." *Howard v. BP Oil Company*, 32 F.3d 520, 524 (11th Cir. 1994) (citing Celotex Corp. v. Catrett, 477 U.S. 317, 324 (1986)). Otherwise stated, the non-movant must "demonstrate that there is indeed a material issue of fact that

precludes summary judgment." *See Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir. 1991). The non-moving party "may not rely merely on allegations or denials in its own pleading; rather, its response .... must be by affidavits or as otherwise provided in this rule be set out specific facts showing a genuine issue for trial." *Vega v. Invsco Group, Ltd.*, 2011 WL 2533755, *2 (11th Cir. 2011). "A mere 'scintilla' of evidence supporting the [non-moving] party's position will not suffice; there must be enough of a showing that the jury could reasonably find for that party." *Walker v. Darby*, 911 F.2d 1573, 1577 (11th Cir. 1990) (citation omitted). "[T]he nonmoving party may avail itself of all facts and justifiable inferences in the record taken as a whole." *Tipton v. Bergrohr GMBH-Siegen*, 965 F.2d 994, 998 (11th Cir. 1992). "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574 at 587 (1986) (internal quotation and citation omitted).

## B. Plaintiff's Claims

Plaintiff claims Defendant's decision not to promote her was motivated by racial and gender discrimination in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e *et seq.*, as amended by the Civil Rights Act of 1991, and 42 U.S.C. § 1981. "It is well established that '[c]laims of race discrimination under 42 U.S.C. § 1981 are analyzed in the same manner as claims brought under Title VII.' " *Bolton v. Baldwin Cty. Pub. Sch.*, 47 F. Supp. 3d 1342, 1349 (S.D. Ala. 2014), aff'd, 627 F. App'x 800 (11th Cir. 2015) (citations omitted). Title VII makes it "an

unlawful employment practice for an employer ... to discriminate against any individual with respect to his [or her] compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e–2(a)(1). A plaintiff may prove discrimination by relying on either direct, circumstantial, or statistical evidence. *See Walker v. NationsBank of Florida N.A.*, 53 F.3d 1548, 1555 (11th Cir. 1995). Direct evidence is evidence which, "if believed, proves the existence of discriminatory motive 'without inference or presumption'" *Hamilton v. Montgomery County Bd. of Educ.*, 122 F.Supp.2d 1273, 1279 (M.D. Ala. 2000) (quoting *Carter v. Three Springs Residential Treatment*,132 F.3d 635, 641 (11th Cir. 1998)). As the U.S. District Court for the Middle District of Alabama explained:

> Not only must it be evidence of discriminatory 'actions or statements of an employer' but the actions or statements at issue must 'correlate to the discrimination or retaliation complained of by the employee.' Further, the statements 'must be made by a person involved in the challenged decision' and must not be subject to varying reasonable interpretations.

*Id.* (quoting *Lane v. Ogden Entertainment, Inc.*, 13 F.Supp.2d 1261, 1274 (M.D. Ala. 1998)). No direct evidence of discrimination has been submitted to the Court. None of the evidence offered proves without inference or presumption that the person who made the employment decisions did so based on Plaintiff's race or gender. Plaintiff has also not attempted to show discrimination through statistical evidence.

A plaintiff may attempt to show discrimination or retaliation based on circumstantial evidence through the application of the *McDonnell Douglas* burden-shifting analysis established by the Supreme Court. *McDonnell Douglas Corp. v.*

*Green*, 411 U.S. 792 (1973).[2]  Under the *McDonnell Douglas* framework, a plaintiff

must first raise an inference of discrimination by establishing a *prima facie* case.

*See Chapman v. AI Transport*, 229 F.3d 1012, 1024 (11th Cir. 2000) (citing *Combs v.*

*Plantation Patterns*, 106 F.3d 1519, 1527-28 (11th Cir.1997)).

Under the *McDonnell Douglas* framework, to prevail on a claim of failure to

promote, a plaintiff may establish a *prima facie* case of discrimination by showing:

> (1) [s]he was a member of a protected class; (2) [s]he sought and was
> qualified for a promotion; (3) despite h[er] qualifications [s]he was
> rejected; and (4) after h[er] rejection, h[er] employer either continued
> to attempt to fill the positions or in fact filled the positions with
> persons outside of h[er] protected class.

*Voudy v. Sheriff of Broward Cty. Fla.*, 701 F. App'x 865, 869 (11th Cir. 2017) (citing

*Walker v. Mortham*, 158 F.3d 1177, 1186 (11th Cir. 1998)). There appears to be no

dispute that Plaintiff is a member of a protected class, that she sought a promotion,

that she was rejected, and that the positions were filled with persons outside her

protected class. However, Defendant contends that Plaintiff was not qualified for

the promotion.

An employee is "qualified for a promotion if the employee offers evidence that

'she satisfied an employer's objective qualifications.' " *Kidd v. Mando Am. Corp.*, 731

---

[2] The McDonnell Douglas framework is not "the only way to use circumstantial evidence to
survive a motion for summary judgment." *Chapter 7 Trustee v. Gate Gourmet, Inc.*, 683 F.3d
1249, 1255 (11th Cir. 2012). "If a plaintiff 'presents circumstantial evidence that creates a
triable issue concerning the employer's discriminatory intent,' she 'will always survive
summary judgment.' " *Id.* (quoting *Smith v. Lockheed–Martin*, 644 F.3d 1321, 1328 (11th
Cir. 2011)). "[I]f the circumstantial evidence is sufficient to raise 'a reasonable inference
that the employer discriminated against the plaintiff, summary judgment is improper.' " *Id.*
(quoting *Lockheed–Martin Corp.*, 644 F.3d at 1328).

F.3d 1196, 1204 (11th Cir. 2013) (quoting *Vessels v. Atlanta Indep. Sch. Sys.*, 408

F.3d 763, 769 (11th Cir. 2005)). "But where the qualifications for the job are neither

objectively verifiable nor easily obtainable or within the plaintiff's possession, the

plaintiff need not satisfy this portion of the prima facie case." *Id.* (internal citations

and quotations omitted). Here, Defendant contends that Plaintiff did not meet the

requirement expressly listed in the job posting that she have at least two years test

and activation experience in a shipyard environment or test training equivalent to

two years technical trade school or military technical school or Navy, Coast Guard

or Merchant Mariner experience. Plaintiff had only about one year of experience

working as a Specialist I but claims she was qualified because she also had three

years of experience as an electrical Apprentice. Defendant concedes that the cable

insulation resistance testing she listed on her amended resume would suffice, but

disputes whether Plaintiff actually conducted those tests, pointing to the fact that

Plaintiff only testified at her deposition that she had performed connectivity and

continuity "tests" as an electrical Apprentice, which Defendant reports would not

qualify. Looking at the evidence in the light most favorable to Plaintiff, as the non-

movant, the Court finds for the purpose of this summary judgment motion that

Plaintiff has sufficiently supported a *prima facie* case.

Once Plaintiff establishes a *prima facie* case of discrimination, the burden

shifts to the Defendant, who must "proffer a legitimate, non-discriminatory reason

for the adverse employment action. The employer's burden is exceedingly light."

*Hamilton*, 122 F.Supp.2d at 1280 (quoting *Meeks v. Computer Assoc. Int'l*, 15 F.3d

1013, 1021 (11th Cir. 1994) (internal quotations omitted)). "Because the employer's burden is one of production—not persuasion—the employer 'need not persuade the court that it was actually motivated by the proffered reason[ ].' " *Kidd*, 731 F.3d at 1205 (quoting *Chapman v. AI Transp.*, 229 F.3d 1012, 1024 (11th Cir.2000)). If the Defendant proffers a legitimate reason for the employment decisions, the burden then shifts back to plaintiff, who must show that the employer's proffered reasons are pretextual, or merely a cover for discrimination. *Id.* "At the pretext stage, in order to survive summary judgment, Plaintiff must provide sufficient evidence to allow a reasonable fact finder to conclude, at a minimum, that the proffered reasons were not actually the motivation for the employer's decision." *Miller v. Bed, Bath & Beyond, Inc.*, 185 F.Supp.2d 1253, 1270 (N.D. Ala. 2002) (citing Combs, 106 F.3d at 1538). Plaintiff may do this "(1) by showing that the employer's legitimate nondiscriminatory reasons should not be believed; or (2) by showing that, in light of all of the evidence, a discriminatory reason more likely motivated the decision." *Id.* (citations omitted). "This is done by pointing to 'such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons . . . that a reasonable factfinder could find them unworthy of credence.' " *Hamilton*, 122 F. Supp.2d at 1281 (quoting *Combs,* 106 F.3d at 1539). The ultimate burden of persuasion remains with the plaintiff at all times in cases involving merely circumstantial evidence. *Texas Dept. of Community Affairs v. Burdine*, 450 U.S. 248, 253 (1981).

 In satisfying the ultimate burden of proving that the adverse employment

action was on account of race, a plaintiff need not establish that race was the sole reason for the action, but that it was a determinative factor in the employer's decision. *See Anderson v. Savage Laboratories, Inc.*, 675 F.2d 1221, 1224 (11th Cir. 1982) (citing *Haring v. CPC International, Inc.*, 664 F.2d 1234, 1239-40 (5th Cir. 1981)).  However, it should be noted that federal courts "do not sit as a super-personnel department that reexamines an entity's business decisions." *Chapman,* 229 F.3d at 1030 (quoting *Elrod v. Sears, Roebuck & Co.*, 939 F.2d 1466, 1470 (11th Cir. 1991)).  It is not appropriate for either the plaintiff or this Court to "recast an employer's proffered non-discriminatory reasons or substitute his business judgment for that of the employer." *Chapman*, 229 F.3d at 1030.  An "employer may fire an employee for a good reason, a bad reason, a reason based on erroneous facts, or for no reason at all, as long as its action is not for a discriminatory reason." *Nix v. WLCY Radio/Rahall Communication*, 738 F.2d 1181, 1187 (11th Cir. 1984).  An employer's reason is not pretext for discrimination "unless it is shown *both* that the reason was false, *and* that discrimination was the real reason." *Brooks v. County Comm'n of Jefferson County*, 446 F.3d 1160, 1163 (11th Cir. 2006) (emphasis in original) (quoting *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 515 (1993)).  Courts "are not in the business of adjudging whether employment decisions are prudent or fair," but rather, their "sole concern is whether unlawful discriminatory animus motivates a challenged employment decision." *Damon v. Fleming Supermarkets of Fla., Inc.*, 196 F.3d 1354, 1361 (11th Cir. 1999).

In the instant case, the decision maker, Brown, contends that he did not even

believe Plaintiff met the minimum qualifications for the position. Plaintiff's initial application did not list the cable insulation resistance testing she later added when she resubmitted her resume. According to Brown, even if she was qualified, she was not among the most qualified applicants because she had not demonstrated her readiness to "own" a system and she was not proactive in initiating testing activity to take ownership of those systems. According to Brown, Plaintiff "did not look ahead of the schedule and plan tasks according to the work that was lying ahead, rather she simply waited to be assigned testing tasks to complete." Brown conceded that Plaintiff's work was consistent with the expectations of a Specialist I but he believed it "was not consistent with the expectations of a Specialist I striving to advance to a Specialist II." Brown "was looking to promote the Specialist Is who had sought growth within the department by volunteering or requesting stretch assignments beyond their Specialist I job description" and according to Brown, Plaintiff had not done that. The Court finds that Defendant has met its burden of proffering a legitimate, non-discriminatory reason for not promoting Plaintiff to a Specialist II. Thus, the burden then shifts back to Plaintiff to show that the employer's proffered reasons are pretextual, or merely a cover for discrimination.

With regard to pretext, Plaintiff asserts that the alleged legitimate reason is totally lacking in merit or truth. Plaintiff argues that her resume listed her time as a Specialist I as well as her time on the job in the Electrical department. However, on Plaintiff's initial application, the work Plaintiff listed having done as an electrical Apprentice did not include work that would qualify. Plaintiff later

submitted an amended resume, but it was not submitted until after the decision to hire the other applicants had been made. Plaintiff argues that Brown and Stubbs were well aware of the fact that Plaintiff did in fact "own" her own systems during the year she worked as a Specialist I. Plaintiff has not submitted any evidence indicating Brown ever directly supervised Plaintiff or had been told or somehow became aware that Plaintiff "owned" her own systems. Stubbs did supervise Plaintiff for a time while she worked as a Specialist I and thus, arguably should have known if in fact Plaintiff "owned" her own systems during that time. Stubbs testified that he did not believe she was among the most qualified applicants because she had not demonstrated her readiness to "own" a system. If Brown and Stubbs were mistaken about Plaintiff's qualifications and/or whether she had or was ready to "own" her own systems, their mistake does not show pretext. As stated above, an "employer may fire an employee for a good reason, a bad reason, <u>a reason based on erroneous facts</u>, or for no reason at all, as long as its action is not for a discriminatory reason." *Nix*, 738 F.2d at 1187 (emphasis added). It is not clear to the Court whether Plaintiff and Defendant are even using the word "own" in exactly the same way. The Court finds there is a genuine dispute of fact whether Plaintiff "owned" her own systems, and if she did, whether Stubbs knew or had reason to know that Plaintiff had owned her own systems. However, even if Plaintiff was qualified for the position and did "own" her own systems during her tenure as a Specialist I, that still does not demonstrate that Plaintiff was discriminated against on the basis of her race or sex. As previously explained, to show pretext Plaintiff

must show not only that the employer's reason was false, but also "that

discrimination was the real reason." *Brooks*, 446 F.3d at 1163 (citation omitted).

Plaintiff argues that Defendant has shown an inconsistent application of

personnel policies in its failure to promote Plaintiff. However, it is unclear what

policies she claims were not followed consistently. Plaintiff contends Defendant has

contradicted itself by claiming Brown considered Plaintiff for the position even

though he did not believe Plaintiff met the qualifications stated in the job posting

and then later, with regard to an application that was submitted eight months

later, Brown still questioned whether Plaintiff met the qualifications. Plaintiff also

argues that a jury could conclude that after she submitted her follow up application

in December 2015, she received no interview from management regarding her

concerns or any deficiencies in her applications or resumes. Plaintiff contends that

an interview would have been the perfect setting for an exchange of concerns by

management and answers from Plaintiff. However, even if interviewing Plaintiff

and investigating Plaintiff's qualifications further would have provided more

accurate answers for Defendant to better base its decision, such actions are not

required by Title VII. As explained above, the Court is not here to judge whether

employment decisions are prudent or fair but whether the decisions were motivated

by unlawful discriminatory animus. *Damon*, 196 F.3d at 1361. The Court does not

find Defendant's statements and actions to be contradictory or inconsistent with

Defendant's policies. Nor does the Court finds that the statements or actions

complained of indicate bias.[3]

Plaintiff claims she was better qualified than one of the applicants that was promoted to Specialist II - Josh Adair. Josh Adair had only been working as a Specialist I since September 15, 2014, about four months after Plaintiff began working as a Specialist I. However, prior to that he had been working at Austal since February 11, 2013 as a Fire Safety Officer/Fire Brigade position in Austal's Safety Department and his prior key experience also included one year of testing damage control systems through his employment with the Prichard Fire Rescue. According to Brown, Josh Adair had demonstrated his readiness to move to a Specialist II. Brown reports that as a Specialist I Adair progressed from supporting the systems he was working on to owning them. Based on Brown's observations and the feedback from Harris and Stubbs, Brown believed Adair had demonstrated he was more qualified than Plaintiff and he had demonstrated a greater ability to perform as a Specialist II than Plaintiff. Brown and Stubbs contend Plaintiff was not proactive in initiating testing activity so as to take ownership of the systems. Plaintiff admits that "sometimes" she lacked motivation to offer "assistance to team members" when she worked as a Specialist I, but Plaintiff otherwise disagrees with Brown and Stubbs' assessment of her.

---

[3] Plaintiff points to no evidence in support of these arguments (see Doc. 48, pp. 11-12), but in her argument she quotes emails between Brown and other employees regarding Plaintiff's qualifications. In an email on December 29, 2015, Brown reportedly questions what another employee's "thoughts/reaction was to what [Plaintiff] wrote." In the email exchange, the HR department ultimately responded with a finding that they did not believe Plaintiff was qualified for a Level II" and recommending that they "not proceed with an interview."

Plaintiff cannot demonstrate pretext by simply quarreling with the wisdom of the employer's seemingly legitimate reason for not promoting her. *Kidd*, 731 F.3d at 1206 (citing *Chapman*, 229 F.3d at 1030). "Indeed, 'a plaintiff cannot prove pretext by simply arguing or even by showing that [s]he was better qualified than the person who received the position [s]he coveted.' " *Id.* (quoting *Springer v. Convergys Customer Mgmt. Grp.*, 509 F.3d 1344, 1349 (11th Cir. 2007)). "The plaintiff 'must show that the disparities between the successful applicant's and [her] own qualifications were of such weight and significance that no reasonable person, in the exercise of impartial judgment, could have chosen the candidate selected over the plaintiff.' " *Id.* (quoting *Springer*, 509 F.3d at 1349).

In the instant case, looking at the evidence in the light most favorable to Plaintiff, the Court finds there is evidence to support Plaintiff's claim that she is as qualified as Josh Adair. However, "the employer has discretion to choose among equally qualified candidates, provided the decision is not based upon unlawful criteria." *Burdine*, 450 U.S. at 259. Even if looking at the evidence in the light most favorable to Plaintiff it could be found that Plaintiff is marginally <u>better</u> qualified than Adair, that would not be enough to show pretext. *See Kidd*, 731 F.3d at 1206. Plaintiff has not supported a finding that she was significantly more qualified such that no reasonable unbiased person could have chosen Adair over Plaintiff. After considering all of the above, the Court finds that Plaintiff has not shown that Defendant's proffered legitimate, non-discriminatory reason for not promoting Plaintiff, was merely pretext.

**CONCLUSION**

For the reasons set forth above, Defendant's motion for summary judgment (Doc. 40), is **GRANTED** and Plaintiff's claims are **DISMISSED with prejudice**.

**DONE** and **ORDERED** this 3rd day of August, 2018.

/s/ Callie V. S. Granade
SENIOR UNITED STATES DISTRICT JUDGE